[No. 34866. *En Banc.* October 8, 1959.]

WILLIAM PERRY *et al., Appellants,* v. SCHOOL DISTRICT NO. 81, SPOKANE COUNTY, *Respondent,* UPPER COLUMBIA MISSION SOCIETY OF SEVENTH DAY ADVENTISTS, INC., *et al., Appellants.*[1]

[1]Reported in 344 P. (2d) 1036.

*Carl Maxey,* for appellants.

*John J. Lally* and *Donald N. Olson,* for respondent.

*Benjamin H. Kizer, Robert D. Dellwo, Kenneth E. Gemmill, Sam L. Levinson, Melville Oseran, Howard P. Pruzan, Solie M. Ringold, Bernard Swerland, Alfred J. Schweppe, Leonard W. Schroeter,* and *Donald S. Voorhees, amici curiae.*

HUNTER, J.—This appeal involves the constitutionality of the released-time program carried on in Spokane in school district No. 81.

The action was instituted by the plaintiffs, William Perry, Bud Cox, Kenneth Roberts and Ray Parringer. They, as taxpayers, sought to have the released-time program, being carried out in Spokane, declared unconstitutional. The Upper Columbia Mission Society of Seventh Day Adventists, Inc., and the International Religious Liberty Association were granted leave to file their complaint as plaintiffs in intervention.

No assignments of error have been made to the findings of fact and they therefore become the established facts of the case. Rule on Appeal 43, 34A. Wn. (2d) 17, as amended, effective January 2, 1953; *Hector v. Martin,* 51

Wn. (2d) 707, 321 P. (2d) 555 (1958). The findings of fact show that, on September 28, 1938, the school board by resolution authorized the release of public school children for one hour per week for religious education upon the written request of their parents. Since that date a released-time program has been in effect within school district No. 81, and since its inception the program has been primarily administered by the Spokane council of churches representing the following denominations: American Baptist, Disciples of Christ, Congregational, Covenant, Lutheran, Methodist, Episcopal, Presbyterian, and United Presbyterian. There is nothing in the board's resolution limiting the program to any particular church or religious faith. In recent years one parish of the Catholic church has participated in the program. The expense of the program is borne by the religious groups involved. No money out of the common school fund or tax funds is contributed to or received directly or indirectly by those instructing the religious classes, or for incidental costs of books and supplies needed or used. The classrooms used for the religious instruction are located off the school grounds, usually in a nearby church. The procedural aspect of the released-time program is carried out in the following manner.

Early in the year, a representative from the religious group calls upon the principal of each individual school and provides a supply of cards upon which parents may indicate their desire to have their children attend the religious instruction. Depending upon the preference of the principal involved, the cards are distributed to the students either by the representative of the religious group or by the individual classroom instructors. In the distribution of these cards, the children are informed of the availability of the religious instruction and are requested to take the cards home to their parents. The Catholic parish involved distributes the request forms from the church, but there is no finding that they do not also distribute the cards in the public schools.

At the appointed hour for the religious instruction, those children whose parents have requested that their children

receive the instruction, by signing and returning the request cards, are released from their regular classroom activities. They are met at the school by an escort provided by the religious group and are taken to the religious instruction classroom. At the end of the religious instruction, the children are returned to their public school classroom by the escort from the religious group.

The religious instruction period corresponds to a school period. In most instances this is from forty-five minutes to one hour, but not in excess of one hour. These religious instruction classes are held once a week, in some instances during all of the school term and in others during only a portion of the term. The children whose parents have not requested their release remain in the classroom where their public school activities continue. In most instances, where there are but few children remaining, the regular group instruction ceases, but the remaining children are kept occupied with special projects, additional individual help, or some other school activity, depending upon the discretion of the classroom teacher. The program is being carried out only in the elementary grades; all students are free to participate or not as their parents desire or request.

The school district, its directors, employees, and agents exercise no control or supervision over the instructors or the material used in any of the religious instruction classes, nor over the scope of the instruction. No report is made by any instructor of the released-time program to the teacher or employee of the district with respect to whether or not a child who was released to participate in the program had actually attended the class. No record is kept by the district or its employees as to actual attendance at the religious instruction classes. The responsibility for attendance at such classes is left with the person who escorts the children for the particular religious group. The children receive no school credit for participation in the released-time program. The function of the defendant school district is to facilitate the distribution of the request cards and thereafter note which children are to be released.

The facts in the trial court were determined by the pleadings and depositions, and by requests for certain admissions of fact served on the defendant, pursuant to Rule of Pleading, Practice, and Procedure 36, 34A Wn. (2d) 99, effective January 2, 1951. The plaintiffs thereupon made a motion for summary judgment pursuant to Rule of Pleading, Practice, and Procedure 19, 34A Wn. (2d) 29, as amended, effective November 1, 1955. Both parties consented that the constitutionality of the released-time program should be determined in this manner. The trial court thereupon entered summary judgment holding that the released-time program was constitutional. The plaintiffs have appealed.

By their assignments of error, the appellants contend the released-time program maintained by the respondent school district is in contravention of the following provisions of the United States constitution, our state constitution, and certain statutory provisions of the state of Washington:

United States constitution, amendment I: " . . . Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . "

United States constitution, amendment XIV, § 1: " . . . No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Washington constitution, Art. I, § 11 (as amended by amendment 4): "RELIGIOUS FREEDOM. Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; . . . *No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment.* . . . " (Italics ours.)

Washington constitution, Art. IX, § 4: "SECTARIAN CONTROL OR INFLUENCE PROHIBITED. All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence."

RCW 28.02.040: " . . . All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence."

RCW 28.27.010: "All parents, . . . shall cause such child to attend the public school of the district in which the child resides for the full time when the school is in session or to attend a private school for the same time.

"The superintendent of the schools of the district in which the child resides, or the county superintendent if there is no district superintendent, may excuse a child from such attendance if the child is physically or mentally unable to attend school, . . . or for any other sufficient reason. . . . "

The released-time program in public schools is not a new question in other jurisdictions, but it is a question that has not been passed upon in this state. This court, however, has consistently strictly construed our state's constitutional prohibition against the use of public funds for any religious purpose, and has likewise so construed the constitutional mandate that our schools supported by public funds shall be free from sectarian control or influence. See *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 173 Pac. 35, 8 A. L. R. 685 (1918); *State ex rel. Clithero v. Showalter*, 159 Wash. 519, 293 Pac. 1000 (1930); *Mitchell v. Consolidated School Dist. No. 201*, 17 Wn. (2d) 61, 135 P. (2d) 79, 146 A. L. R. 612 (1943); *Visser v. Nooksack Valley School Dist. No. 506*, 33 Wn. (2d) 699, 207 P. (2d) 198 (1949).

The precise question raised in the instant case was before the United States supreme court in *State ex rel. McCollum v. Board of Education*, 333 U. S. 203, 92 L. Ed. 649, 68 S. Ct. 461, 2 A. L. R. (2d) 1338; and *Zorach v. Clauson*, 343 U. S. 306, 96 L. Ed. 954, 72 S. Ct. 679. In the former, the released-time program as practiced in the State of Illinois was held to be in violation of the first amendment to the United States constitution. In the latter, the released-time program as practiced in the state of New York was held not to be in contravention of any United States constitutional provisions. In *Gordon v. Board of Education*, 78 Cal. App. (2d) 464, 178 P. (2d) 488, in commenting up-

on the wide practice of released-time programs in the states of this country, the court stated:

"The California Released School Time Religious Education Program authorized by section 8286 of the Education Code, is not new in the United States. Either by express statutory provisions, court decisions, rulings of the State Attorneys General, or opinions of state boards of education or Chief State School Officers, forty states authorize the release of public school pupils for weekly religious education classes. And it is noteworthy that no appellate court of any state has held such programs unconstitutional. . . ."

It is safe to say that the released-time program in itself has never been held to be in contravention of the doctrine of separation of church and state, nor of any state or federal constitutional provisions; it is only the manner in which it has been practiced that has constituted a violation. Each case is determined by its own facts.

In the *McCollum* case, *supra*, the local board of education in Champaign, Illinois, participated in a released-time program wherein (1) religious training took place in school buildings and on school property; (2) the place for instruction was designated by school authorities; (3) pupils taking religious instruction were segregated by school authorities according to faiths; (4) school officials supervised and approved the religious teachers; (5) pupils were solicited in school buildings for religious instruction; (6) registration cards were distributed by the school and in one case printed by the school.

In the released-time program as practiced in New York state (*Zorach v. Clauson, supra*), none of the above factors was present; (1) there was no supervision or approval of religious teachers and no solicitation of pupils or distribution of cards; (2) the religious instruction was required to be held outside the school buildings and grounds; (3) no announcement of any kind was permitted in the public schools relative to the program, neither was any comment allowed by any principal or teacher on the attendance or non-attendance of any pupil released for religious instruction. All that the school did besides excusing the pupil was

to keep a record, which was not availabe for any other purpose, in order to see that the excuses were not taken advantage of and that the school was not deceived, being the same procedure the school would follow in respect to absence for any other reason. Justice William O. Douglas, in the majority opinion in the *Zorach* case, *supra,* compares the released-time programs under the *Zorach* and *McCollum* cases, *supra,* as follows:

"New York City has a program which permits its public schools to release students during the school day so that they may leave the school buildings and school grounds and go to religious centers for religious instruction or devotional exercises. A student is released on written request of his parents. Those not released stay in the classrooms. The churches make weekly reports to the schools, sending a list of children who have been released from public school but who have not reported for religious instruction.

"This 'released time' program involves neither religious instruction in public school classrooms nor the expenditure of public funds. All costs, including the application blanks, are paid by the religious organizations. The case is therefore unlike *McCollum v. Board of Education,* 333 U. S. 203, which involved a 'released time' program from Illinois. In that case the classrooms were turned over to religious instructors. We accordingly held that the program violated the First Amendment which (by reason of the Fourteenth Amendment) prohibits the states from establishing religion or prohibiting its free exercise."

The arguments of the appellants in the *Zorach* case, *supra,* are similar and in essence do not differ from those advanced by the appellants in the instant case. Quoting further from the *Zorach* case, the court said:

" . . . Their argument, stated elaborately in various ways, reduces itself to this: the weight and influence of the school is put behind a program for religious instruction; public school teachers police it, keeping tab on students who are released; the classroom activities come to a halt while the students who are released for religious instruction are on leave; the school is a crutch on which the churches are leaning for support in their religious training; without the cooperation of the schools this 'released time'

program, like the one in the *McCollum* case, would be futile and ineffective. . . . "

We quote extensively from the reasoning of the *Zorach* case, *supra,* in view of its applicability here:

" . . . our problem reduces itself to whether New York by this system has either prohibited the 'free exercise' of religion or has made a law 'respecting an establishment of religion' within the meaning of the First Amendment.

"It takes obtuse reasoning to inject any issue of the 'free exercise' of religion into the present case. No one is forced to go to the religious classroom and no religious exercise or instruction is brought to the classrooms of the public schools. A student need not take religious instruction. He is left to his own desires as to the manner or time of his religious devotions, if any.

"There is a suggestion that the system involves the use of coercion to get public school students into religious classrooms. There is no evidence in the record before us that supports that conclusion. The present record indeed tells us that the school authorities are neutral in this regard and do no more than release students whose parents so request. If in fact coercion were used, if it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented. Hence we put aside that claim of coercion both as respects the 'free exercise' of religion and 'an establishment of religion' within the meaning of the First Amendment.

"Moreover, apart from that claim of coercion, we do not see how New York by this type of 'released time' program has made a law respecting an establishment of religion within the meaning of the First Amendment. There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment. See *Everson v. Board of Education,* 330 U. S. 1; *McCollum v. Board of Education, supra.* There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every

and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.'

"We would have to press the concept of separation of Church and State to these extremes to condemn the present law on constitutional grounds. The nullification of this law would have wide and profound effects. A Catholic student applies to his teacher for permission to leave the school during hours on a Holy Day of Obligation to attend a mass. A Jewish student asks his teacher for permission to be excused for Yom Kippur. A Protestant wants the afternoon off for a family baptismal ceremony. In each case the teacher requires parental consent in writing. In each case the teacher, in order to make sure the student is not a truant, goes further and requires a report from the priest, the rabbi, or the minister. The teacher in other words cooperates in a religious program to the extent of making it possible for her students to participate in it. Whether she does it occasionally for a few students, regularly for one, or pursuant to a systematized program designed to further the religious needs of all the students does not alter the character of the act.

"  .   .   .

"  .   .   . The constitutional standard is the separation of Church and State. The problem like many problems in constitutonal law, is one of degree. See *McCollum v. Board of Education, supra,* p. 231.

"In the *McCollum* case the classrooms were used for re-

ligious instruction and the force of the public school was used to promote that instruction. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction. We follow the *McCollum* case. But we cannot expand it to cover the present released time program unless separation of Church and State means that public institutions can make no adjustments of their schedules to accommodate the religious needs of the people. We cannot read into the Bill of Rights such a philosophy of hostility to religion."

The reasoning of the *Zorach* case, *supra,* is sound and reflects the reasoning of the state courts which have passed upon the same question, except that of the state of Illinois to a limited degree in the *McCollum* case, *supra.* It answers the contentions of the appellants in the instant case as to the violation of the United States constitutional provisions by the released-time program practiced in Spokane, as authorized by the respondent in so far as the facts of the *Zorach* case are here applicable.

The significant difference in the facts of the *Zorach* case and the instant case can be at once observed and that is the practice permitted by the respondent of the distribution of the cards and the making of announcements by the representatives of religious groups or school instructors relative to the program in the classrooms or on school premises. This practice was among those present in the *McCollum* case, and which was absent in the *Zorach* case. Moreover, this *is a use* of school facilities supported by public funds for the promotion of a religious program, which contravenes Art. I, § 11 of our state constitution. *State ex rel. Dearle v. Frazier, supra; State ex rel. Clithero v. Showalter, supra; Mitchell v. Consolidated School Dist. No. 201, supra; Visser v. Nooksack Valley School Dist. No. 506, supra.*

This practice has the further *effect* of *influencing* the pupils, while assembled in the classrooms, as a "captive audience" to participate in a religious program, contrary to the express provisions of Art. IX, § 4 of our state constitution:

" . . . All schools maintained or supported wholly or

in part by the public funds shall be forever free from sectarian control or *influence."* (Italics ours.)

■ The appellants contend that the released-time program permitted by the respondent disrupts the instruction of the children remaining in the classrooms, to their detriment, and is a violation of the equal-protection clause of the state constitution and the United States constitution. This contention is not supported by the record. To the contrary, the children remaining in school are assigned to special projects and receive the advantage of individual instruction during the released-time periods.

■ The appellants further contend the compulsory school attendance laws are being violated by the released-time program. We disagree. The superintendent of schools is vested with statutory discretion to excuse pupils from the operation of the enactment for reasons recited in the statute and for "any other sufficient reason." The release of children from school upon the parent's request for religious instruction, constitutes an exercise of this statutory authority.

Our state constitution like that of the United States and every state in the Union, by the language used, indicates the framers were men of deep religious beliefs and convictions, recognizing a profound reverence for religion and its influence in all human affairs essential to the well-being of the community. See *Gordon v. Board of Education, supra* (concurring opinion). Our Preamble reads as follows:

"We, the people of the State of Washington, *grateful to the Supreme Ruler of the Universe for our liberties,* do ordain this constitution." (Italics ours.)

It was never the intention that our constitution should be construed in any manner indicating any hostility toward religion. Instead, the safeguards and limitations were for the preservation of those rights. No limitations of the constitution are contravened by the respondent school district permitting a released-time program in its schools, if practiced in a manner not inconsistent with the constitutional limitations as outlined in this opinion.

We hold the following practice in the released-time program, permitted by the respondent, to be in contravention of Art. I, § 11 (as amended) and Art. IX, § 4 of the state constitution, *i.e.*, the distribution of cards in public schools, or the making of announcements or explanations for the purpose of obtaining the parents' consent for their children's participation in the released-time program, by representatives of religious groups or instructors in the schools.

The judgment of the trial court is affirmed subject to a remand of the cause for modification consistent with this opinion. It is so ordered.

ALL CONCUR.

WEAVER, C. J. (concurring)—I have signed the foregoing opinion. I wish to point out, however, that Art. IX, § 4, of the Washington constitution, which provides

"SECTARIAN CONTROL OR INFLUENCE PROHIBITED. All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.",

is more proscriptive than the other constitutional provisions discussed in the opinion.

That it is so is the result of deliberate action by the constitutional convention of 1899. It appears from the journal of the Washington State Constitutional Convention, 1889, p. 335 (unpublished; the original is in the office of the Secretary of State), that J. Z. Moore, a member of the convention and a lawyer from Spokane, moved to strike the words "or influence" from the section. The motion lost 39 to 11.

---

December 16, 1959. Petition for rehearing denied.