**Richard GARNETT, et al., Plaintiffs,**

v.

**RENTON SCHOOL DISTRICT NO. 403, et al., Defendants.**

**No. C87–1294M.**

United States District Court,
W.D. Washington.

Dec. 23, 1987.

---

William H. Ellis, Steven T. McFarland, Ellis & Li, Seattle, Wash., for plaintiffs.

Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Wash., amicus curiae American Civil Liberties Union of Wash. Foundation.

R. Broh Landsman, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for Anti Defamation League of B'Nai B'Rith.

George W. Akers, Montgomery, Purdue, Blankinship & Austin, Seattle, Wash., for defendants; co-counsel: Scott M. Stickney, Donald E. Murray, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Seattle, Wash.

Thomas Bovard, Brooke Hedge, Theodore Hirt, U.S. Dept. of Justice, Washington, D.C., for plaintiff intervenor.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

McGOVERN, District Judge.

### INTRODUCTION

Three Lindbergh High School students and one former student are the Plaintiffs in this case. The Complaint states that Defendants' refusal to permit a student-initiated and led fellowship group (whose purpose is to discuss the Bible and its application to student issues and to offer prayer, support, and encouragement to each other) to meet at the high school as other groups do violates (1) the Equal Access Act, (2) the First Amendment—freedom of speech, free exercise of religion, freedom from state hostility toward religion under the establishment clause; and (3) equal protection, due process and reciprocal guarantees of the Washington State Constitution.

Plaintiffs have been meeting off campus in a church which is "immediately adjacent to the Lindbergh High School campus, directly across the parking lot." (Affidavit of Brian Barker at 5.)

Plaintiffs pray for an order enjoining defendants, *inter alia,* from refusing to per-

mit them to conduct meetings of their club on school premises during noninstructional time, and for a declaration of their rights under the United States Constitution and the Equal Access Act (EAA) and that Defendants have created a "limited open forum" for purposes of the applicability of the EAA.

■ Accepting that Plaintiffs have no adequate remedy at law because constitutional rights are allegedly violated, the likelihood of Plaintiffs' success on the merits must be analyzed together with the issue of irreparable harm if the requested relief is or is not granted. *See, e.g., People of Village of Gambell v. Hodel*, 774 F.2d 1414, 1419 (9th Cir.1985). The moving party must demonstrate some combination along the continuum represented by the extremes of either (1) probable success on the merits and irreparable injury or (2) serious questions are raised and the balance of hardships tips sharply in its favor. *See, e.g., Regents of the University of California v. ABC, Inc.*, 747 F.2d 511, 514–15 (9th Cir.1984); *Benda v. Grand Lodge of the International Ass'n of Machinists*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

### BALANCE OF HARDSHIPS

The matter of hardship will be considered first. Plaintiffs allege that the mere deprivation of constitutional rights for even minimal periods of time constitutes irreparable injury, *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), and they also contend "stigmatization" from being banned from school facilities because of the content of their speech.

On the other hand, Defendants contend that to grant Plaintiffs their requested injunctive relief would force them into violating the Establishment Clause of the U.S. Constitution as well as the Washington State Constitution, Article I, Section 11, which provides:

> No public money or property shall be appropriated for or applied to any religious worship, exercise, instruction, or the support of any religious establishment. . . .

And Article IX, Section 4, which provides:

> All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

Thus, Plaintiffs allege harm from deprivation of Constitutional rights while Defendants argue harm in being forced to violate constitutional rights should injunctive relief be granted. The balance of hardships appears, therefore, to be in equipoise. Thus, whether injunctive relief ensues depends upon who is more likely to succeed on the merits.

### LIKELIHOOD OF SUCCESS ON THE MERITS

#### Summary Conclusion

The relief prayed for by Plaintiffs must be denied because

(1) Plaintiffs have not created a "limited open forum" for purposes of applicability of the EAA;

(2) Even if a "limited open forum had been created, the EAA by its own terms cannot operate to require activity prohibited under Washington State's Constitution (Article I, Section 11 and Article IX, Section 4);

(3) The Court need not, therefore, address the constitutionality of the EAA under the United States Constitution;

(4) Plaintiffs' rights under the U.S. Constitution of free speech, association, and exercise of religion are not infringed.

#### Plaintiffs' Contentions and EAA Provisions

■ Plaintiffs contend that Defendants are violating the Equal Access Act (EAA) by refusing to treat their student-initiated religious group the same as other student-initiated groups. Under the EAA, a school having a "limited open forum" may not deny access to school premises for meetings by noncurriculum-related, student-initiated groups on the basis of the religious content of the speech at such meetings. The Act explains that a "public secondary

school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). Even if there were no EAA, argue the Plaintiffs, their constitutional rights of free speech, freedom of association, and free exercise of religion are being infringed when the school prohibits the group from meeting on the premises.

Whether the EAA applies under the facts in this case must first be determined. To answer that question, it must be determined whether Lindbergh High School has a "limited open forum," that is, whether noncurriculum-related student groups have been granted "an offering or opportunity" by the school to meet on school premises during noninstructional time. The statute provides that

(c) Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that—

(1) the meeting is voluntary and student-initiated;

(2) there is no sponsorship of the meeting by the school, the government, or its agents or employees;

20 U.S.C. § 4071 (items 3–5 omitted as not pertinent).

Plaintiffs contend that Lindbergh High School has a "limited open forum" because student groups permitted to meet on campus includes the following 15 clubs: Bowling Club, Dance Squad, Distributive Education Club of America (DECA), Diversified Occupations Club of America (DOCA), Future Business Leaders of America (FBLA), International Club, LIMITS Club (Lindbergh Modern Insight & Technology Society), Minority Student Union, Ski Club, SKY Club (Special Kiwanis Youth), Vocational Industrial Clubs of America (VICA), Chess Club (Advanced Strategy & Tactics Club), Girls Club, Pep Club ("Spirit Connection"), and Varsity Club.

Plaintiffs and Defendants submit different standards or criteria for determining what clubs are curriculum related. The statute does not define "noncurriculum related groups," but it does provide that if certain other indicia are present as to a "noncurriculum related" group, the school will be deemed to "offer a fair opportunity" for such student group to meet and, thus, trigger the Act: part (c) at (1) and (2) provides that the meeting be voluntary and student initiated and that there be no sponsorship of the meeting by the school, the government or its agents or employees.

All 15 of the challenged clubs are sponsored by the school district; indeed, they comprise part of the curriculum of the school:

The public high school curriculum, for that matter the curriculum of a school district, is the educational program which consists of all of those programs, whether they be academic or nonacademic, which give effect to the mission of the school district as decided by the local board of directors.

(Bumgarner Deposition at 6). Dr. Bumgarner is presently Assistant Superintendent for Curriculum Instruction for Bethel School District and worked for 9 years for the State Superintendent of Public Instruction where he was curriculum director. (*Id.* at 4.) He also explains that Washington is a "local control" state, meaning that each of the 296 school boards of directors decides the school curriculum for its district, observing minimum graduation requirements and specific course offerings required by state law. "Beyond that then, the curriculum is what the local school board says it is." (Bumgarner Deposition at 8.) Dr. Bumgarner explains that nonacademic activities tend to "hook a student's interest into the school via some other things they are interested in" and they then "tend to do better in all of school." (Bumgarner Deposition at 11.) In determining whether to make a particular nonacademic club part of the curriculum, among other things, student interest and availability of local facilities are considered. Thus, ski clubs are typically included in the curriculum and a bowling club might be if there were bowling lanes nearby and student interest.

There was concern in Congress that a school could frustrate the intent of the Act by deeming all student clubs to be sponsored by the school except those it would discriminate against such as religious clubs. Congress changed the test employed by the Act from "nonschool sponsored" to "noncurriculum related." Plaintiffs thus argue that if the school district permits the meeting of clubs that are student initiated, the Act is triggered. Professor Laurence Tribe addressed this issue before Congress and stated:

> I would imagine that nonschool sponsored groups does not mean groups that are not recognized in any way by the school. It simply means groups whose formation is not initiated or substantively directed, or endorsed by school authorities, so that I would imagine that the reference in the statute to nonschool sponsored groups would include clubs that are student initiated, but presumably not things like honor societies that represent an official extension of school policy.

(Hearings on the Religious Speech Protection Act: Hearings on H.R. 4996, before the Subcommittee on Elementary, Secondary and Vocational Education of Committee on Education and Labor, House of Representatives, 98th Cong.2d Sess. § 52 (1984); see Exhibit B to Plaintiff's Trial Memorandum.) The key point is that none of the challenged clubs is demonstrated to be student initiated and student directed and without sponsorship and substantial direction by the school through a faculty advisor or a teacher of a related course. It is not a case that Lindbergh has simply deemed student clubs to be sponsored; instructional goals have been considered by the Renton School District in making the clubs part of its curriculum.

Both Plaintiffs and Defendants cite legislative history, particularly the exchange between Senators Gorton and Hatfield. The entire colloquy between Senators Gorton and Hatfield reflects specific concerns of Senator Gorton about the operation of the Act: when the application of the Act is triggered what authority the school district has to determine what is curriculum related and what is not, and whether there are any effective limits to the kind of organizations that can be permitted in a public school with a "limited open forum". Senator Hatfield agreed that once a school has said yes to a student-initiated, noncurriculum-related group that would like to meet on school premises during noninstructional time, the requirement of the Act would go into effect. 130 Cong.Rec. S 8342 (daily ed., June 27, 1984).

> Mr. HATFIELD: ... The school says, in effect, "We are going to have a student activities period or a period for noninstructional activity, and students who have voluntarily initiated a request in which they want to associate themselves," that school says, "Yes, you may use the school facility before or after school for that purpose."

> Once the school has established that, all this amendment says is you cannot dictate the content of the forum.

> Mr. GORTON: Once it allows one such group, it must allow other groups, under the so-called equal access.

(*Id.*)

Senator Gorton's inquiry then turned to the question of determining what groups are curriculum related:

> Mr. GORTON. Let me ask the Senator this question: What about the high school football team? Is it a noncurriculum-related student group?

> Mr. HATFIELD. It is curriculum-related because that is how they can use tax dollars. The coaches are hired by the school administration. It is the department of physical education in which they teach health classes, courses within the curriculum. The athletic teams are curriculum-related. That is how we govern them in terms of antidiscrimination legislation as well because they are part of that body.

> Mr. GORTON. Would the school district have the full authority to determine where the line is to be drawn between curriculum-related activities and noncurriculum-related?

Mr. HATFIELD. We in no way seek to limit that discretion.

Mr. GORTON. So if the school district were to determine that the girls cheerleading squad, for example, should be led by a teacher, it could make the determination that it was curriculum-related.

Mr. HATFIELD. Correct.

Mr. GORTON. And, therefore, the existence of that group would not be a nonrelated [sic] forum?

Mr. HATFIELD. Correct.

Mr. GORTON. Could the school make the same determination with reference to a chess club?

Mr. HATFIELD. I would not say that no school district could, but I cannot readily conceive of a criterion that could be used at this time to establish that as a curriculum-related activity. I am not saying it could not be, because as long as you have lawyers, they can find ways of doing things one way or another.

Mr. GORTON. They could, I take it, determine to be curriculum-related a drama club putting on a play?

Mr. HATFIELD. They could, yes, because you have courses in high school now in the arts, various and sundry arts, for instance, the school orchestra. The school band would come out of the music department. You have the other cultural activities including, as the Senator pointed out, the drama club.

130 Cong.Rec. S 8342 (daily ed., June 27, 1984). This exchange manifests the idea that the degree to which a variety of possible student groups may be related to the curriculum varies along a continuum; thus, for example, a math club would be directly related to the body of mathematics courses within a curriculum, while a chess club would be more tenuously related to the mathematics curriculum.

A school board, such as Renton's, may determine that there is high student interest in a chess club, that it would be a good companion to a mathematics course, that such a club meets instructional goals, and as a result adopt it as part of the curriculum. The process of designing a curriculum of academic and nonacademic elements to meet educational objectives and foster student interest in the school and its courses of study is the prerogative of educators with their expertise and circumspection. Districts will vary in their curricula; wealthier districts may offer more courses and related activities; rural districts will offer activities catering to different interests than will urban districts. Whether or not to allow a student group with no faculty support to meet on school premises is a different kind of decision than design of a curriculum. The challenged clubs became part of Lindbergh High School's program through curriculum design and are part of the fabric of course offerings.

Senator Leahy spoke of the importance of what a school actually does in distinction to the school's formal decision about whether to have a limited open forum:

> The point is that a limited open forum should be triggered by what a school does, not by what it says. The careful wording of the current draft will protect both religious and secular interests because it speaks with clarity about what a limited open forum means.

U.S.Cong.Rec. S 8341 (daily ed., June 27, 1984).

It appears that both the formal decision on curriculum and the actions of Renton School District and Lindbergh High School demonstrate that a "limited open forum" is neither desired nor tolerated. Lindbergh's school district does not wish to create a "limited open forum" because it does not wish to run afoul of the Washington State Constitution. While Renton School District has developed a curriculum that includes certain nonacademic activities, these activities are important elements of the curriculum. As demonstrated by the deposition testimony of Dr. Bumgarner, Principal Barker, and others, moreover, the challenged activities are directly or closely related to course work or have a delegated administrative function.

Because the curriculum in Washington schools including Lindbergh High School, includes academic courses as well as selected nonacademic activities, the challenged activities—part of the curriculum—do not

trigger the EAA. Moreover, these activities are supervised by faculty advisers and are so closely related to course work or are so integral a part of the traditional and official school programs that they cannot reasonably be termed "noncurriculum related" nor voluntary and student-initiated and without school sponsorship or direction.

*The Washington Constitution and the EAA*

██ Senator Leahy stated his belief in the lofty accomplishment made by the Equal Access Act:

> The equal access amendment we propose today makes an important statement about ideas. It says that ideas are sacred to Americans, whether or not they concern religion. It says that student-initiated religious groups have the same rights to meet on school property during noninstructional time as any other groups. And it says that secular student groups have no greater—or lesser—rights than do religious groups.
>
> This amendment sets forth common-sense rules to guide schools in opening their doors to these noncurriculum groups in a manner that stresses fairness and equity, yet in a manner that does not allow through indirection what would never be permitted directly—the sponsorship or the appearance of sponsorship of religion by our public schools.

130 Cong.Rec. S 8341 (daily ed., June 27, 1984). Thus, the EAA seeks to provide a constitutional means for public schools to allow religious as well as secular groups to use school premises, so long as there is no school sponsorship of a religious group initiated by students. The question then becomes whether the neutral operation of a law that would bring religious clubs onto school premises—albeit without school sponsorship or teacher supervision or assistance—nevertheless would appear to create an impermissible atmosphere of religious partisanship.

The answer in Washington State is yes. The mandatory provisions of the EAA may not be applied in Washington State to permit religious organizations to meet on school premises owing to provisions of this state's constitution and relevant case law construing their application. The Washington Constitution "requires a far stricter separation of church and state than the federal constitution...." *Witters v. Commission for the Blind,* 102 Wash.2d 624, 626, 689 P.2d 53 (1984), *rev'd sub nom. on other grounds, Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). Two provisions of the state constitution prohibit the relief requested here. Article I section 11 denies religious groups any use of public money or property:

> No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment.

Article IX section 4 expressly forbids any sectarian influence in the public schools:

> All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

The amicus curiae memorandum of the Anti–Defamation League of the B'nai B'rith (ADL) presents a well organized and cogent discussion of Washington law persuasive of the conclusion that Plaintiffs' requested relief is prohibited because it would (1) tend to introduce sectarian influence into Lindbergh High School and (2) would result in an impermissible appropriation of public money or property for religious worship or exercise. First, the prohibition of sectarian influence or control is absolute under Article IX, section 4:

> While the establishment clause broadly condemns any law "respecting an establishment of religion," our constitution specifically demands that no public funds be used to maintain or support any school which is under sectarian control or influence. There is no such thing as a 'de minimis' violation of Article 9, section 4. Nor is a violation of this provision determined by means of a balancing process. The words of Article 9, section 4 mean precisely what they say: *the prohibition is absolute.*

(Citations omitted, emphasis supplied.) *Weiss v. Bruno*, 82 Wash.2d 199, 206, 509 P.2d 973 (1973). *Weiss* concerned state tuition assistance whereby the student recipient could choose to attend schools with or without religious sponsorship. Because a portion of the grant funds went to students attending parochial school, the Washington Supreme Court held the program unconstitutional, stating:

> Any use of public funds that benefits schools under sectarian control or influence—regardless of whether that benefit is characterized as "indirect" or "incidental"—violates this provision.

82 Wash.2d at 211, 509 P.2d 973. The Court further held:

> Const. art. 9, § 4 does not provide that a minimal amount of sectarian control or influence is permissible. We cannot say that any of these schools is completely free from such influence.

82 Wash.2d at 228, 509 P.2d 973. ADL argues, and the Court agrees that if Bible study groups are allowed to meet on school premises during the school day, Lindbergh High School will no longer be *completely free* from sectarian influence:

> Plaintiffs, who by filing this suit have demonstrated drive, initiative and deep religious feelings, undoubtedly will have substantial influence within the school. Article IX section 4 prohibits all sectarian influence in the public schools, no matter how slight. The considerable influence that plaintiffs' religious group is likely to have in Lindbergh High School is not permitted by the state constitution.

ADL Memorandum at 7. The proscription of "influence" as well as "control" by sectarian elements was a conscious decision:

> It is indisputable that this more restrictive clause was the deliberate design of the framers of our constitution. The statehood compact with the United States required that provision be made for a public school system free from sectarian *control....* Obviously not satisfied with the broader concept of control, the authors of our constitution added the words "or influence." A motion to strike those words failed.

(Emphasis in original, citations omitted.) 82 Wash.2d at 206, 509 P.2d 973.

Second, the ban on the use of public funds for religious purposes is—like the ban of influence and control by sectarian elements—absolute and without exception. That there is also no de minimus appropriation of money or property for a religious purpose is demonstrated by *Perry v. School District No. 81*, 54 Wash.2d 886, 344 P.2d 1036 (1959). There, a program permitting students to be released from school for religious study off school premises was held unconstitutional because (1) the program was announced on school bulletin boards and (2) the school distributed cards on which students could express interest in participating in the program. This use of school facilities and personnel to distribute the cards constituted an impermissible "use of school facilities supported by public funds for the promotion of a religious program." *Id.* at 896, 344 P.2d 1036.

Similarly, a program permitting public school students to receive academic credit for religious study outside the school system was declared unconstitutional in *State Ex Rel. Dearle v. Frazier*, 102 Wash. 369, 173 P. 35 (1918) because the expenditure of time by public school teachers to determine the number of credits to give students for independent religious studies would constitute an appropriation of funds for religious instruction in violation of Article I section 11 no matter how small the expenditure of time by the teachers or how slight, indirect, or consequential the benefit to religion.

ADL reasons from the above cases and the Court agrees:

> Plaintiffs here ask for much more substantial public support than was held unconstitutional in *Perry* or in *Frazier*. Plaintiffs seek to hold their meetings on public school property, a direct and unambiguous "application of property" for religious worship or exercise. The use of school personnel to supervise religious clubs for compliance with the federal Equal Access Act and the use of bulletin boards or other common areas of the school to advertise religious club meet-

ings are all uses of public personnel or public funds to support religion. Each is as substantial as the use of school facilities for announcements or the distribution of cards in *Perry* or the use of teacher time in *Frazier* to determine credit for outside religious study.

ADL Memorandum at 9. Finally, ADL contends that a bright line demarcation of church and state, as provided in Washington's constitution, is the surest approach to maintaining separation of these entities; there can be no tolerance for sectarian influence no matter how slight.

The conclusion is unavoidable that if Plaintiffs were to obtain their requested relief, the meetings of their religious club on school premises would amount to at least a slight benefit to religion, a benefit that is prohibited by Washington's Constitution.

■ The EAA does not require the Renton School District to permit an unconstitutional use of school property. The EAA by its own terms does not force Renton School District No. 403 and Lindbergh High School *"to sanction meetings that are otherwise unlawful; ... or to abridge the constitutional rights of any person."* 20 U.S.C. § 4071(d)(5), (7) and under Washington's Constitution, meetings of religious groups on school premises would be unconstitutional because such meetings would introduce sectarian influences into the school and because they would result in an impermissible appropriation or public money on property for a religious purpose.

It is, therefore, unnecessary to determine the constitutionality of the EAA under the U.S. Constitution as the EAA's mandatory provisions have not been triggered and likely will not be triggered in Washington State because the Washington Constitution implicitly demands that no school allow a "limited open forum" to exist if it means religious clubs may use school premises. Religious groups are thus prevented from receiving implied state approval and from receiving incidental benefits from the state.

While the EAA may not have been intended to favor religious groups, the intended neutral application of the EAA would nevertheless result in impermissible sectarian influence (however slight) and impermissible appropriation of public funds (however small) were a school district to create a "limited open forum" and allow student religious organizations to meet on school premises. Although some religious organizations might welcome the impression of state sponsorship of their student clubs and the easy access to potential converts that the school setting might provide, as stated by the ADL,

[t]here is no good reason why religious groups *must* meet on the school premises, during the school day, and under school supervision:

1. Any student can pray to himself anytime and anyplace;

2. Students can informally congregate and pray or discuss religion at school during free time;

3. There are innumerable churches, homes, offices and other private and public facilities students can use to meet during non-school hours;

4. Students can obtain released time if required for religious worship;

5. Students can elect to go to private religious schools.

ADL Memorandum at 2, 3.

*Free Exercise, Free Association, Free Speech, Equal Protection, and Due Process Rights*

■ The constitutional rights that Plaintiffs claim are violated by the school's refusal to allow their religious club to meet on campus are bound together in this context where the concept of religious freedom and its relationship to the operation of a governmental institution come together. *Brandon v. The Board of Education of the Guilderland Central School District,* 635 F.2d 971 (2d Cir.1980) has addressed these issues. Free exercise infringement involves a showing of a coercive effect upon a particular religious ritual, *id.* at 976; no such showing is made here. Plaintiffs' religious group is nondenominational (see, Germino Affidavit, ¶ 15). Plaintiffs' free exercise rights are not infringed, as the balance between religious speech and

the constitutional values of neutrality toward religion and separation of church and state is properly struck. Permitting religious club meetings on school premises would have violated the Washington State Constitution. Avoidance of this conflict with the Washington Constitution is a "compelling state interest." Plaintiffs are not precluded entirely from religious meetings in being denied the use of school facilities; they have been meeting in a church across the parking lot from the school.

In *Brandon,* the plaintiff's free speech, association and equal protection arguments were unavailing as they are here. The court pointed to two significant factors: a high school is not a public forum like a park where religious views can be freely aired, and the Establishment Clause limits the right to air religious doctrines. *Id.* at 980.

[redacted] As to equal protection and due process concerns, a religious group must be treated differently than others because of the Establishment Clause and especially because of the provisions in the Washington Constitution; moreover, all religious groups are treated the same.

CONCLUSION

The 15 challenged clubs at Lindbergh High School are nonacademic activities that are elements of the official curriculum and are closely related (some more than others) to specific academic courses. The activities are substantially directed and supervised by faculty members. Some of the activities are required with course work and thus are not voluntary, none have been shown to be student initiated (although their existence indicates a certain level of student interest), and all are decidedly school sponsored. Lindbergh High School has not, therefore, created a "limited open forum" under the Equal Access Act, which would require it to allow all noncurriculum-related, student-initiated, nonschool sponsored groups—including Plaintiffs' religious club—to meet on school premises during noninstructional time.

Even if Lindbergh High School had created a "limited open forum," and even with the neutral operation of the EAA allowing students to meet on school premises but without school sponsorship, under Washington's constitutional law such meetings would (1) tend to introduce sectarian influence into Lindbergh High School and (2) would result in an impermissible appropriation of public money or property for a religious purpose. The EAA itself provides that a state need not break its own laws in order to observe EAA requirements.

Lindbergh High School's refusal to permit Plaintiffs to conduct meetings on school premises is proper, and neither Plaintiffs' free exercise, free association, free speech, equal protection, nor due process rights have been infringed. Religious groups must be treated differently because of Establishment Clause concerns and restrictive provisions in Washington's Constitution.

Plaintiffs are not, therefore, entitled to the injunctive relief that would allow their religious group to meet on Lindbergh High School premises.

There being no likelihood that Plaintiffs would succeed on the merits, their motion for preliminary injunction is DENIED.

The Clerk of the Court shall direct uncertified copies of this Order to counsel of record.