[No. 49673-1. En Banc. April 20, 1989.]

LARRY WITTERS, *Appellant,* v. THE COMMISSION FOR THE BLIND, *Respondent.*

*Michael P. Farris* of *Concerned Women for America Education and Legal Defense Foundation,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *David R. Minikel* and *Timothy R. Malone, Assistants,* for respondent.

*Judith A. Endejan* on behalf of American Civil Liberties Union, amicus curiae for respondent.

ANDERSEN, J.—

FACTS OF CASE

In this case we consider for the second time whether error was committed when a visually handicapped student was denied state financial assistance to enable him to attend a private bible college with the goal of becoming a pastor, missionary or church youth director. We hold that when a person "*is getting a religious education*" (italics ours), to use the words of his attorney, that person comes squarely within the express prohibition contained in the Constitution of the State of Washington that "*[n]o public money . . . shall be appropriated for or applied to any religious . . . instruction*". (Italics ours.) Const. art. 1, § 11 (part). Accordingly, the Washington State Commission for the Blind and the Superior Court for Spokane County did not err when they denied state financial assistance for his education. Phrasing it a bit differently, our state constitution prohibits the taxpayers from being put in the position of paying for the religious instruction of aspirants to the clergy with whose religious views they may disagree.

Appellant Larry Witters, who will be referred to herein as the "applicant", applied for vocational rehabilitation funds from the Washington State Commission for the Blind (Commission) in 1979.[1] He planned to use the funds to pursue a course of study that would prepare him for a career as a pastor, missionary or youth director. At the time of his request, the applicant was enrolled at the Inland Empire School of the Bible in Spokane pursuing a 3–year Bible diploma. Later, he switched to a 4–year program that would earn him a biblical studies degree from Inland Empire School of the Bible and a bachelor of arts degree from Whitworth College. His curriculum included Old and New Testament studies, ethics, speech and church administration.

---

[1]The Washington State Commission for the Blind is now the Department of Services for the Blind. *See* RCW 74.18 which in 1983 replaced former RCW 74.16 and 74.17. Laws of 1983, ch. 194, § 3, p. 1050.

The applicant qualifies as a legally blind person under the physical and medical eligibility requirements specified in RCW 74.16.[2] Funding for the Commission's assistance program is provided by both federal (80 percent) and state (20 percent) moneys. The Commission denied the applicant's request on the basis of its policy statement, which states: "Private institutions or out–of–state institutions: The Washington State Constitution forbids the use of public funds to assist an individual in the pursuit of a career or degree in theology or related areas." After an unsuccessful internal administrative review, the applicant appealed the action to the Superior Court for Spokane County under the state administrative procedure act.[3] On May 26, 1982, following a hearing, the trial court entered findings of fact and conclusions of law affirming the Commission's order, also on state constitutional grounds.

In 1984, this court affirmed the decision of the Commission and the Superior Court holding that "the provision of state aid to a person studying to be a pastor, missionary, or church youth director violates the establishment clause of the first amendment to the United States Constitution." *Witters v. Commission for the Blind,* 102 Wn.2d 624, 626, 689 P.2d 53 (1984), *rev'd sub nom. Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986). This court did not reach the state constitutional grounds on which both the Commission and the Superior Court had relied. Instead, it based its decision on the United States Supreme Court's 3–part test for determining the constitutionality of state aid under the establishment clause of the first amendment to the United States Constitution:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally, the

---

[2]Repealed, Laws of 1983, ch. 194, § 30, p. 1057.

[3]RCW 34.04; *see also* former RCW 74.16.530(1).

statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971), *quoted in Witters,* 102 Wn.2d at 628. After concluding that the first criterion was met, this court held that the second criterion, primary effect, was not.[4] The court declined to address entanglement, the third *Lemon* criterion.[5] Finally, this court rejected the applicant's free exercise clause argument and declined to address his equal protection clause argument.[6]

In 1986, the United States Supreme Court reversed this court's 1984 decision. *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986). It rejected this court's analysis of the second *Lemon* criterion and remanded the case to us for further proceedings.

Pursuant to that remand, we now address three principal issues.

## ISSUES

ISSUE ONE. Does the Constitution of the State of Washington prohibit the Commission from granting vocational rehabilitation funds to a visually handicapped applicant to use at a religious institution for a course of study designed to prepare him for a career as a pastor, missionary or youth director?

ISSUE TWO. If the Constitution of the State of Washington is a bar to the applicant's request for educational assistance, is such denial of funds a violation of the free exercise clause of the First Amendment?

ISSUE THREE. If the Constitution of the State of Washington is a bar to the applicant's request, is the denial of

---

[4]*Witters v. Commission for the Blind,* 102 Wn.2d 624, 629, 689 P.2d 53 (1984), *rev'd sub nom. Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986).

[5]*Witters,* 102 Wn.2d at 630.

[6]*Witters,* 102 Wn.2d at 631–32.

funds to the applicant a violation of the Fourteenth Amendment equal protection clause?

## DECISION

ISSUE ONE.

CONCLUSION. The Commission and the Superior Court did not err in denying state financial assistance for the applicant to use for religious instruction; the Constitution of the State of Washington, article 1, section 11, prohibits this.

As the United States Supreme Court observed in its opinion in this case, "[t]he Establishment Clause of the First Amendment has consistently presented this Court with difficult questions of interpretation and application."[7] Then, after concluding that there was no violation of that clause of the federal constitution, and that the case should be remanded, the United States Supreme Court also held that "[o]n remand, the state court is of course free to consider the applicability of the 'far stricter' dictates of the Washington State Constitution, see *Witters* v. *Commission for the Blind,* 102 Wash. 2d, at 626, 689 P. 2d, at 55."[8]

■ Article 1, section 11 of the Constitution of the State of Washington provides in pertinent part:

No public money or property shall be appropriated for *or applied to* any religious worship, exercise or *instruction,* or the support of any religious establishment . . .

(Italics ours.) Here, the applicant is asking the State to pay for a religious course of study at a religious school, with a religious career as his goal. This falls precisely within the clear language of the state constitutional prohibition against applying public moneys to any religious instruction. Indeed, as counsel for the applicant summarized at oral argument before this court:

---

[7]*Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 485, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986).

[8]*Witters,* 474 U.S. at 489.

*We would concede that Larry Witters is getting a religious education.*

(Italics ours.) Our state constitution prohibits the use of public moneys to pay for such religious instruction.

This court has twice construed the term "religious instruction".

In *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 P. 35 (1918), the court struck down a school board resolution giving high school credits for Bible study done outside of school, even though the course of study covered only the "historical, biographical, narrative and literary features of the Bible".[9]

On the other hand, the court upheld the teaching of "English 390: The Bible as Literature" at the University of Washington in *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wn.2d 912, 436 P.2d 189 (1967), *cert. denied,* 393 U.S. 960 (1968). In *Calvary,* the court interpreted "religious instruction" as used in article 1, section 11 to mean "instruction that is devotional in nature and designed to induce faith and belief in the student."[10] The court went on to say:

> There can be no doubt that our constitutional bars are absolute against *religious* instruction and indoctrination in specific religious beliefs or dogma; but they do not proscribe open, free, critical, and scholarly examination of the literature, experiences, and knowledge of mankind.

*Calvary,* at 919.

In this case, Inland Empire School of the Bible is a Christian college. The applicant's course of study is designed to prepare him for a career promoting Christianity. His Bible study and church courses necessarily provide indoctrination in the specific beliefs of Christianity. Thus, for the Commission to provide vocational assistance funds to the applicant as he requests would violate article 1,

---

[9] *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 373, 173 P. 35 (1918).

[10] *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wn.2d 912, 919, 436 P.2d 189 (1967), *cert. denied,* 393 U.S. 960 (1968).

section 11 of the Constitution of the State of Washington because public money would be applied to religious instruction.

The applicant urges that we examine the vocational rehabilitation program as a whole and not focus on his individual participation in the program. His argument ignores the "sweeping and comprehensive"[11] language of Const. art. 1, § 11, which prohibits not only the *appropriation* of public money for religious instruction, but also the *application* of public funds to religious instruction. Herein lies a major difference between our state constitution and the establishment clause of the first amendment to the United States Constitution. It follows that to apply federal establishment clause analysis to article 1, section 11 of the state constitution as the applicant urges would be inappropriate.

Having concluded, as we do, that article 1, section 11 of our state constitution is dispositive of the issue of whether the Constitution of the State of Washington prohibits the funding of the applicant's vocational rehabilitation plan, we need not consider the parameters of article 9, section 4 of the state constitution.[12]

ISSUE TWO.

CONCLUSION. Neither the applicant's freedom to believe nor his freedom to act in a manner consistent with his beliefs is being encroached by the article 1, section 11 ban on expenditure of state funds for religious instruction. The applicant's right to free exercise of religion has not been violated.

This court has already held that denial of aid to the applicant herein did not violate the applicant's right to the

---

[11]*Dearle*, at 375. *See also Garnett v. Renton Sch. Dist. 403*, 675 F. Supp. 1268, 1275 (W.D. Wash. 1987); *Perry v. School Dist. 81*, 54 Wn.2d 886, 344 P.2d 1036 (1959).

[12]"All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence." Const. art. 9, § 4.

free exercise of religion.[13] The fact that we now base denial of the funds on article 1, section 11 of our state constitution instead of the establishment clause of the first amendment to the United States Constitution does not affect this court's earlier analysis and conclusions on the free exercise of religion issue.

A state action is constitutional under the free exercise clause if the action results in no infringement of a citizen's constitutional right of free exercise or if any burden on free exercise of religion is justified by a compelling state interest.[14] To prevail in a free exercise case, the complaining party must show "the coercive effect of the enactment as it operates against him in the practice of his religion."[15] As this court held, "[t]he challenged state action must somehow compel or pressure the individual to violate a tenet of his religious belief."[16]

Here, the applicant is not being asked to violate any tenet of his religious beliefs, nor is he being denied benefits "because of conduct mandated by religious belief".[17] This case is dissimilar to those in which persons have been pressured by state policies to choose between benefits or rights and practicing their religion.[18]

---

[13]*Witters,* 102 Wn.2d at 631.

[14]*Sherbert v. Verner,* 374 U.S. 398, 403, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963).

[15]*School Dist. v. Schempp,* 374 U.S. 203, 223, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963).

[16]*Witters,* 102 Wn.2d at 631.

[17]*Thomas v. Review Bd.,* 450 U.S. 707, 718, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981).

[18]*See Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 94 L. Ed. 2d 190, 107 S. Ct. 1046 (1987); *Thomas v. Review Bd., supra; Widmar v. Vincent,* 454 U.S. 263, 70 L. Ed. 2d 440, 102 S. Ct. 269 (1981); *McDaniel v. Paty,* 435 U.S. 618, 55 L. Ed. 2d 593, 98 S. Ct. 1322 (1978); *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963); *see also Employment Div., Or. Dep't of Human Resources v. Smith,* ___ U.S. ___, 99 L. Ed. 2d 753, 108 S. Ct. 28 (1988).

As this court already held when this case was before it earlier,

> In the present case, the Commission's denial of vocational aid to the [applicant] did not compel or pressure him to violate his religious beliefs. [Applicant] chose to become a minister, and the Commission's only action was to refuse to pay for his theological education. The Commission's decision may make it financially difficult, or even impossible, for [applicant] to become a minister, but this is beyond the scope of the free exercise clause. We hold that the Commission's refusal to provide financial assistance did not violate the free exercise clause of the federal constitution.

*Witters,* 102 Wn.2d at 631. As Justice Douglas also aptly expressed it in *Sherbert v. Verner,* 374 U.S. 398, 412, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963):

> The fact that government cannot exact from me a surrender of one iota of my religious scruples does not, of course, mean that I can demand of government a sum of money, the better to exercise them. For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government.[19]

For the foregoing reasons, the Commission's denial of funds to the applicant does not violate the free exercise clause of the United States Constitution.

ISSUE THREE.

CONCLUSION. Denial of vocational assistance funds to the applicant herein is not a violation of the equal protection clause of the Fourteenth Amendment.

■ The classification here at issue is the Commission's policy of denying vocational funding of any student's religious studies. This classification is directly related to the state's interest in ensuring the separation of church and state, as required by the Constitution of the State of Washington. The state has a compelling interest in maintaining the strict separation of church and state set forth in

---

[19]Quoted in part in *Lyng v. Northwest Indian Cemetery Protective Ass'n,* __ U.S. __, 99 L. Ed. 2d 534, 108 S. Ct. 1319 (1988).

Const. art. 1, § 11.[20] The applicant's individual interest in receiving a religious education must therefore give way to the state's greater need to uphold its constitution.

We again uphold the Commission's decision, and that of the Superior Court, to deny applicant's request for vocational assistance in funding his religious instruction. To provide the specific aid requested would violate article 1, section 11 of the Constitution of the State of Washington. Denial of such aid, therefore, does not violate the equal protection clause of the Fourteenth Amendment.[21]

In any event, the denial of tuition for religious instruction is but a refusal of state funds to advance religion in a constitutionally impermissible way; the Commission has not discriminated against the applicant because he is religious, but has refused to use state moneys to pay for his religious activities.

Affirmed.

CALLOW, C.J., and BRACHTENBACH, PEARSON, and SMITH, JJ., concur.

UTTER, J. (dissenting)—The majority's analysis of Const. art. 1, § 11 is contrary to the meaning and purpose of this provision in our state constitution. The decision by the Washington State Commission for the Blind to exclude Mr. Witters from the vocational rehabilitation program is not required by the language in our constitution, our previous holdings, or the evidence in this case. It also jeopardizes public funding for students who study nonreligious courses at religious institutions. Additionally, as Justice Dolliver states in his dissenting opinion, and as I have previously stated in *Witters v. Commission for the Blind,* 102 Wn.2d 624, 633, 689 P.2d 53 (1984) (Utter, J., dissenting), *rev'd sub nom. Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g*

---

[20]*Garnett,* 675 F. Supp. at 1276–77.

[21]*See Garnett,* 675 F. Supp. at 1277.

*denied,* 475 U.S. 1091 (1986), the State's attempt to condition the receipt of vocational rehabilitation assistance on the absence of a "religious" career goal unconstitutionally abridges the recipient's right under the United States Constitution to freely exercise his faith. For these reasons, I dissent.

The majority holds that an individual who meets all of the state and federal legislative criteria for participating in the vocational rehabilitation program for the blind must be excluded entirely from the program because some of his vocational training may involve "religious" instruction. Yet the State has completely failed to show that Mr. Witters' vocational training constitutes such instruction or that public funding in his case is forbidden.

The majority suggests that this harsh result is mandated by the establishment clause of our state constitution, Const. art. 1, § 11. In reaching its conclusion, the majority fails to follow the interpretive guidelines for state constitutional analysis this court has only recently developed. *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986); *State v. Reece,* 110 Wn.2d 766, 757 P.2d 947 (1988). Consequently, it reaches a result that I cannot support.

Const. art. 1, § 11 states: (1) no "public money" (2) shall be "appropriated . . . or applied" by the State (3) to "religious . . . instruction". A careful examination of these three clauses reveals three major defects in the majority opinion. First, "public money" refers only to those funds emanating from the state treasury; since state money contributes only 20 percent of the funding for this vocational rehabilitation program, the state constitution affects only that portion. Second, application of these funds for instruction at a religious institution is the result of a personal decision by the individual recipient, not the State; therefore, the State would not be "appropriating or applying" the funds. Third, this court has previously defined "religious instruction" to be that instruction which is devotional in nature and is intended to induce faith in the pupil. There is no evidence in the record to support the

majority's conclusion that all or any of Mr. Witters' training will involve such instruction.

I

The majority fails to address Mr. Witters' argument that the term "public money" as used in Const. art. 1, § 11 refers only to the portion of this vocational rehabilitation program involving state funds. Without stating its reasons or citing any authority, the majority implies that the state constitution governs the entire program, even though 80 percent of the funds derive from the federal government.

The implication is erroneous. Const. art. 1, § 11 prohibits the State from appropriating "public money" for religious worship or instruction. The term "public money" refers only to those revenues raised by the state government, not those raised by the federal government. The definition of "public money" as that term is used in Const. art. 1, § 11 is well settled. As this court stated in *Washington Health Care Facilities Auth. v. Spellman,* 96 Wn.2d 68, 73, 633 P.2d 866 (1981):

> The reasonable meaning of "public money" in article 1, section 11 is money from the treasury of this state or its municipalities, not some other governmental exchequer.

The constitutional constraints apply only to those funds appropriated by the State; in this case, money from the state treasury represents only 20 percent of the program.

The state constitution does not prohibit a state agency from disbursing federal funds to Mr. Witters. Therefore, at a minimum, Mr. Witters is entitled to vocational rehabilitation funding in proportion to the federal funds involved in this program.

II

Const. art. 1, § 11 prohibits the State from "appropriating or applying" public money for religious instruction. In granting Mr. Witters money for his vocational training, the State is neither appropriating nor applying funds for religious instruction. The State is merely appropriating public funds for a neutral vocational rehabilitation program

designed to assist the visually handicapped in developing skills necessary for employment. The decision to apply those funds for instruction at a religious or secular school is made by the individual aid recipient, not the State. As the United States Supreme Court unanimously observed:

> Any aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients. . . .

*Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 487, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986).

The State's program of vocational rehabilitation for the blind is in stark contrast to other state funded programs which have fallen afoul of Const. art. 1, § 11. In *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 P. 35 (1918), the court struck down a program giving high school students credits for Bible study outside the school. As that court stated, "the vice of the present plan is that school credit is to be given for instruction at the hands of sectarian agents." *Dearle,* at 378. Similarly, this court struck down funding programs in which the primary beneficiaries were students at parochial or religious schools. *Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973); *State Higher Educ. Assistance Auth. v. Graham,* 84 Wn.2d 813, 529 P.2d 1051 (1974).

The constitutional infirmity of those cases is not present here. The vocational rehabilitation program for the blind is not structured to confer public benefits to students at religious or parochial schools; no evidence has been presented indicating that any other student pursuing a religiously oriented career has applied for these funds. Therefore, to the extent that students at parochial or religious schools benefit at all, it is incidental to the primary purpose and effect of the program.

The majority suggests that in order to determine whether the application of public funds violates Const. art. 1, § 11 we must examine how the individual recipient of such

funds chooses to apply the money. The majority provides no precedent for such a microscopic examination of the use of public assistance funds. Such an approach lacks any support in our case law and will have serious unintended consequences. If the use of vocational rehabilitation funds can be so constrained by government regulators, the same logic would allow the state government to impose conditions on the expenditure of other public funds by individual recipients.

It is far more reasonable and consistent to confine our analysis to the nature of the public assistance program itself. If the program itself does not violate the constitution, then our inquiry should end. The purpose of the constitutional prohibition against appropriating or applying public funds for religious instruction is to constrain state government actions, not individual decisions. Since the only state action involved here is appropriating funds for a neutral vocational rehabilitation program, there is no violation of Const. art. 1, § 11. For the same reasons that the State does not now attempt to prevent a salaried public official or recipient of unemployment compensation from giving their public money for "religious worship, exercise or instruction", the State should not be allowed to control the career choices of a recipient of vocational rehabilitation funds.

### III

In affirming the Commission's decision to reject Mr. Witters' application for funds, the majority relies on an alternative theory to the one used by the Commission. The Commission denied vocational rehabilitation funds to Witters because it concluded that the state constitution "forbids the use of public funds to assist an individual in the pursuit of a *career* or degree in theology or related areas." The Commission excluded Mr. Witters from this program because his vocational objective was to become a pastor, missionary or youth director. This court also focused on Mr. Witters' career goals when it ruled that the provision of state aid to him would violate the federal establishment

clause. *Witters v. Commission for the Blind,* 102 Wn.2d 624, 626, 689 P.2d 53 (1984), *rev'd sub nom. Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986).

Without addressing the issue, the majority implicitly rejects the religious career rationale as did the State upon reargument before this court. This is just as well. The state constitution does not prohibit application of public funds for vocational training of an individual preparing for a religious career. Const. art. 1, § 11 is very specific; it restricts public funding of religious *instruction,* not instruction for individuals pursuing religiously oriented careers. To this extent, the court is reversing that portion of the Commission's policy that discriminates against those applicants pursuing religiously oriented careers.

Although the majority rightfully abandons the religious career rationale, it asserts a new rationale which was not presented to the trial court that is equally indefensible. The majority now says that Mr. Witters must be excluded from the rehabilitation program not because of his vocational objectives per se but because his vocational training may involve some "religious instruction". This conclusion is not supported by the record. The State has introduced no evidence describing the nature of the instruction Mr. Witters is receiving.

There is only one case in Washington law that defines "religious instruction" as that phrase is used in Const. art. 1, § 11. In *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wn.2d 912, 436 P.2d 189 (1967), *cert. denied,* 393 U.S. 960 (1968), this court stated that

the framers of our constitution did not intend the word "instruction" to be construed without limit, but that the proscribed field be confined to that category of instruction that resembles worship and manifests a devotion to religion and religious principles in thought, feeling, belief, and conduct, *i.e., instruction that is devotional in*

*nature and designed to induce faith and belief in the student.*

(Italics mine.) *Calvary,* at 919.

The *Calvary* court demonstrated that the only way to determine whether any instruction is "religious" within the meaning of Const. art. 1, § 11 is to examine the instruction itself and see whether it is objective or devotional in manner. *Calvary,* at 920–21. Finding that the teaching of "English 390: The Bible as Literature" at the University of Washington was not designed to induce faith and belief in the student, the court held that this course was not "religious instruction"; therefore, public funding of it did not violate Const. art. 1, § 11. *Calvary,* at 921.

Mr. Witters' curriculum includes courses in Old and New Testament, ethics, speech, and church administration. Aside from this general information, we know little about the vocational training Mr. Witters is receiving. The State has produced no evidence regarding the manner of instruction. The parties stipulated only that the "classwork consists of classes instructional in nature for which he pays tuition. There are also devotional chapel services at the school for which he pays nothing." Petitioner's Proposed Factual Stipulation (Aug. 11, 1980) (signed by counsel for both parties). The parties also stipulated that the college Mr. Witters wished to attend was not a denominational or sectarian institution. Verbatim Report of Proceedings, at 6.

Given the absence of any evidence regarding Mr. Witters' other courses and the manner of instruction, the majority's conclusion that his program of study amounts to "religious instruction" rests on no more than speculation. The majority hypothesizes that because Mr. Witters is attending a Christian college and intends to pursue a religious career, his courses "necessarily provide indoctrination in the specific beliefs of Christianity." Majority, at 369. This is mere guesswork and is hardly a sufficient basis for a constitutional ruling. If all instruction of a nondevotional nature at a Christian college is "religious instruction", then we have radically expanded, without reason, the barriers of our constitution.

The vocational objective of pastor, missionary or youth director does not imply that an individual would take only those courses offering "religious instruction". Even if Mr. Witters attended courses on the Bible and church administration, our decision in *Calvary* recognizes that instruction in these subjects can be objective and nondevotional.

Aside from the absence of any factual basis to support a finding that *any* of Mr. Witters' course work involves "religious instruction", the majority attempts to prove too much in suggesting that *all* of Mr. Witters' training would involve such instruction. Even the State concedes that not all courses at the Inland Empire School of the Bible are necessarily religious in nature. The State further concedes that use of public funds for tuition to cover nonreligious courses at private religious institutions would not violate Const. art. 1, § 11. Brief of Appellant, at 21–24 (on remand from the United States Supreme Court). This court should do no less.

The majority's holding will have dramatic effect on other public assistance programs that indirectly benefit students at private schools. By refusing to allow vocational rehabilitation funds to cover *any* portion of Mr. Witters' course work, the majority jeopardizes the public funding relied upon by countless other students in this state who study nonreligious courses but are attending religious or parochial schools. By failing to demand the State sustain its burden to prove the courses taken by Witters are devotional in nature and designed to induce faith and belief in the student, the majority calls into doubt the clear holding in *Calvary Bible Presbyterian Church v. Board of Regents, supra.* It creates a needless barrier not required by the language, spirit, or history of our state constitution.

The State has constitutional authority to exclude Mr. Witters from the vocational rehabilitation program only for that portion of his training which involves "religious instruction". The State has failed to show that any of Mr. Witters' vocational training involves "religious instruction". Because the evidence does not indicate that any of Mr.

Witters' vocational training will include "religious instruction", he is entitled to the full amount of state and federal benefits under the program.

## IV

Many of the pitfalls in the majority's analysis could be avoided if this court adopted a more systematic approach to interpreting Const. art. 1, § 11. A meaningful analysis must begin with application of the guidelines this court has articulated to facilitate constitutional decisionmaking.

In *Gunwall,* this court announced several nonexclusive neutral guidelines to assist courts in deciding whether to interpret state constitutional provisions differently than the United States Supreme Court's interpretation of analogous provisions of the United States Constitution. *State v. Gunwall,* 106 Wn.2d at 56–61. These guidelines were articulated to facilitate state constitutional analysis and prevent result–oriented jurisprudence. Writing for a unanimous court, Justice Andersen stated that the purpose of the *Gunwall* criteria is

> to insure that if this court does use independent state constitutional grounds in a given situation, it will consider these criteria to the end that our decision will be made for well founded legal reasons and not by merely substituting our notion of justice for that of . . . the United States Supreme Court. . . . Recourse to our state constitution as an independent source . . . must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned.

*Gunwall,* at 62–63.

The court listed six nonexclusive criteria: (1) textual language of the state constitution; (2) significant differences in the texts of parallel provisions of the federal and state constitutions; (3) state constitutional and common law history; (4) preexisting state law; (5) differences in structure between the federal and state constitutions; and (6) matters of particular state interest or local concern. *Gunwall,* at 61–62. Although the *Gunwall* criteria create no presumption for the federal analysis of analogous provisions of the

United States Constitution, they do serve as useful interpretive aids when state courts must decide whether to interpret analogous state constitutional provisions differently. *Reece,* 110 Wn.2d at 778.

Inexplicably, the majority discusses none of the *Gunwall* criteria. Thus, we have no principled analysis to explain why this court chooses to interpret the state establishment clause to prohibit that which a unanimous United States Supreme Court has expressly approved under the establishment clause of the federal constitution. *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986). Without such analysis, the resort to independent state grounds to reach a different result in this case appears to spring from the "pure intuition" that this court rightly scorned in *Gunwall.*

A close examination of the *Gunwall* criteria demonstrates why application of the state constitution in this instance should not lead to a different result than that reached by the United States Supreme Court.

## A
### LANGUAGE

The first two criteria of *Gunwall* direct the court to consider the language of the state constitution and the parallel provision of the federal constitution. There is no question that the language of the federal and state establishment clauses is different. The First Amendment provides in relevant part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .

Const. art. 1, § 11 provides:

> No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . .

While the language of the state constitution appears to be more specific in prohibiting the State from appropriating funds for religious instruction, it is not necessarily any

more or less restrictive in application to specific fact situations than the federal establishment clause.

The majority suggests a different result than that reached by the United States Supreme Court is mandated by the "far stricter" language of the state constitution. This characterization of the Washington establishment clause does not by itself support the conclusion that the state constitution must differ from the federal constitution on this particular issue. The doctrinaire rigidity with which the majority attempts to interpret Const. art. 1, § 11 is not justified by the document's purpose and history and has received well deserved criticism in the scholarly literature. *See* Conklin & Vache, *The Establishment Clause and the Free Exercise Clause of the Washington Constitution—A Proposal to the Supreme Court,* 8 U. Puget Sound L. Rev. 411 (1985) (suggesting that the rigid ideological interpretation of Const. art. 1, § 11 reflected in some of this court's previous opinions owes more to anti–Mormon and anti–Catholic sentiment in the late 19th century than to any careful examination of its terms).

In certain cases where language differences have compelled it, this court has interpreted the state establishment clauses more strictly than federal courts interpreting the federal establishment clause. *See State ex rel. Dearle v. Frazier, supra; State ex rel. Clithero v. Showalter,* 159 Wash. 519, 293 P. 1000 (1930); *Visser v. Nooksack Vly. Sch. Dist. 506,* 33 Wn.2d 699, 207 P.2d 198 (1949). However, this court has also adopted the approach of the United States Supreme Court when that court has considered an identical issue under the federal establishment clause. Thus, in *Perry v. School Dist. 81,* 54 Wn.2d 886, 344 P.2d 1036 (1959), this court followed the approach of the United States Supreme Court in holding that a "release time" program allowing students in the public schools to be released for 1 hour per week to receive religious education did not violate Const. art. 1, § 11 so long as neither class time nor school facilities were used to promote the program. *Perry,* at 895–96 (following *Illinois ex rel. McCollum*

*v. Board of Educ.*, 333 U.S. 203, 92 L. Ed. 649, 68 S. Ct. 461 (1948) and *Zorach v. Clauson*, 343 U.S. 306, 96 L. Ed. 954, 72 S. Ct. 679 (1952)). Differences in language between the state and federal establishment clauses do not support a different result in every case. The majority does not present a reasonable argument that such differences compel a contrary result in this case.

The state constitution is an expression of the people's will and depends for its validity on their ratification. *See State ex rel. Albright v. Spokane*, 64 Wn.2d 767, 770, 394 P.2d 231 (1964). The words used must be given their common ordinary meaning at the time the particular provision was adopted. *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 557, 452 P.2d 943 (1969). The "common and ordinary meaning" is the meaning the words had to the vast majority of ordinary voters. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. Puget Sound L. Rev. 491, 510 (1984). As the Wisconsin court stated, the words must be construed in the context of the "general run of voters to whom they were submitted". *B.F. Sturtevant Co. v. Industrial Comm'n*, 186 Wis. 10, 19, 202 N.W. 324 (1925). The primary rule of state constitutional interpretation is that "the constitution is the expression of the people's will, adopted by them" and the intent to be determined is that of the people who ratified it. *Albright*, at 770. *See also State ex rel. Linn v. Superior Court*, 20 Wn.2d 138, 143, 146 P.2d 543 (1944).

Thus, the court must determine the "common and ordinary meaning" of the term "religious instruction" to those who drafted and ratified the state constitution. Consideration of this issue arises under the third *Gunwall* criterion.

## B
### CONSTITUTIONAL AND COMMON LAW HISTORY

Courts must often resort to extrinsic sources in order to determine the meaning of constitutional terms. *State v. Brunn*, 22 Wn.2d 120, 139, 154 P.2d 826, 157 A.L.R. 1049

(1945). In *State ex rel. Mason Cy. Logging Co. v. Wiley,* 177 Wash. 65, 74, 31 P.2d 539 (1934), this court declared that "the public history of the times should be consulted, and should have weight'" in giving meaning to the terms used. A variety of sources are available to assist this court in determining the meaning and purpose of the "religious instruction" clause of Const. art. 1, § 11. Two very useful sources are the Enabling Act, through which the federal government authorized the citizens of the Washington Territory to call a constitutional convention and proceed to statehood, and the *Journal of the State Constitutional Convention, 1889* (B. Rosenow ed. 1962). In addition, this court has used contemporary newspapers' accounts of the state constitutional convention to supplement the official minutes since no verbatim record of the convention exists. *Yelle v. Bishop,* 55 Wn.2d 286, 293, 347 P.2d 1081 (1959).

Consideration of these various historical sources demonstrates that the sole purpose of the "religious instruction" clause of Const. art. 1, § 11 was to prevent public schools from giving sectarian religious instruction and to prevent the use of public funds to support private parochial schools.[22] *See State ex rel. Dearle v. Frazier,* 102 Wash. 369, 381, 173 P. 35 (1918); *School Dist. 20 v. Bryan,* 51 Wash. 498, 99 P. 28 (1909). *See* Utter & Larson, *Church and State on the Frontier: The History of the Establishment Clauses in the Washington State Constitution,* 15 Hastings Const. L.Q. 451 (1988). There is no evidence of any intent by those who drafted and ratified our state constitution to prohibit the use of public money for the purposes proposed by Mr. Witters. The State's denial of aid to Mr. Witters based on misperceived mandate of Const. art. 1, § 11 was improper.

---

[22]I have previously set forth the relevant history of Const. art. 1, § 11. *See Witters v. Commission for the Blind,* 102 Wn.2d at 643–49 (Utter, J., dissenting). I note that none of the conclusions from my earlier discussion are disputed by the majority in the present opinion.

The federal Enabling Act of 1889 which authorized the Washington Constitutional Convention contained a significant limitation in the area of religious freedom. The Enabling Act required that the state constitution include a provision for the "establishment and maintenance of systems of public schools, which shall be open to all the children . . . and free from sectarian control." Enabling Act, ch. 180, § 4, 25 Stat. 676 (approved Feb. 22, 1889), *reprinted in* Revised Code of Washington, vol. 0 at 20 (1987). This provision reflected a widespread concern about the contemporary practice of Bible reading and other sectarian religious instruction in the public primary and secondary schools. *See* D. Boles, *The Bible, Religion, and the Public Schools* 35 (1961); Utter & Larson, 15 Hastings Const. L.Q. at 458–67. Such practices were particularly offensive to the recent waves of Catholic and Jewish immigrants who objected to their children receiving compulsory instruction in the majority Protestant faith. *See* B. Parkany, *"Religious Instruction" in the Washington Constitution* (1965) (thesis available in the Washington State Library); D. Boles, *supra.*

The general consensus in Washington and the rest of the country was that public schools should not give sectarian religious instruction, and that private schools should not be supported by public funds. *See* B. Parkany, pt. 2, at 14; D. Boles, at 23–27, 33. This attitude was reflected in many state constitutions, including Washington's, that were written in the last half of the 19th century. D. Boles, at 33–34.

The Washington Constitutional Convention met in Olympia on July 4, 1889. That the Convention was concerned with forced religious instruction in public primary and secondary schools and public aid to parochial schools is supported by a number of circumstances surrounding the adoption of the "religious instruction" clause itself. On July 17, 1889, the Seattle Post–Intelligencer and the Tacoma Morning Globe both printed the Bill of Rights Committee's first draft of Const. art. 1, § 11. At that point, this provision

contained no reference to "religious instruction." B. Parkany, pt. 1, at 6.

Two days later, on July 19, the Portland Oregonian, which was one of the most widely read newspapers in Washington Territory, ran an editorial concerning "religious instruction" in public schools. The editorial used the phrase "religious instruction" six times, and concluded with a strong stand:

> In order that liberty of conscience may remain inviolate . . . there must be an absolute separation of church and state, religion and public schools . . . [I]t is necessary to keep the public schools free from religious influences, from theological disputes and sectarian teachings. . . .
>
> . . .
> . . . Religious instruction in the public school means a gradual retrogression to the union of church and state, and this union means a tyrannical government and a corrupt priesthood. . . . [I]f liberty of conscience is valued at all, keep religion away from public schools.

The Oregonian, July 19, 1889, at 4, col. 2. On the same date, a Spokane newspaper also used the phrase "religious instruction" in an article summarizing the views of eminent clergymen on both sides of the debate. Spokane Falls (Daily) Review, July 19, 1889, at 3.

On July 25, a few days after the flurry of newspaper editorials, articles and letters to the editor on religious instruction in the public primary and secondary schools, the Bill of Rights Committee submitted its amended report to the Convention. The new draft, which was later adopted by the Republican–dominated Convention without debate, read in pertinent part as follows:

> Absolute freedom of conscience in all matters of religious sentiment, belief, and worship, shall be guaranteed to every individual . . . No public money or property shall be appropriated for, or applied to any religious worship, exercise or instruction, or the support of any religious establishment. . . .

*Journal of the Washington State Constitutional Convention, 1889,* at 500 (B. Rosenow ed. 1962); B. Parkany, pt. 1, at 1.

The circumstantial evidence is strong that the phrase "religious instruction" that had been added by the Bill of Rights Committee was borrowed from the various newspaper articles published between the first and last drafts of its report. The frequent use of this phrase in the popular press and in the context of discussions relating to religious instruction in the public primary and secondary schools provides uncontradicted evidence as to the "common and ordinary meaning" of the phrase among those who drafted and ratified the constitution in 1889.

This court addressed the intent of the framers in drafting Const. art. 1, § 11 in *State ex rel. Dearle v. Frazier,* 102 Wash. 369, 173 P. 35 (1918). Although the validity of much of that opinion was undermined in *Calvary Bible Presbyterian Church v. Board of Regents,* 72 Wn.2d 912, 436 P.2d 189 (1967), *cert. denied,* 393 U.S. 960 (1968), no subsequent case has challenged the accuracy of the *Dearle* court's statement that

> it is a matter within the common knowledge of those who followed the discussion attending the framing of our [state] constitution that it was the purpose of the men of that time to avoid all of the evils of religious controversies, the diversion of school funds to denominational schools and institutions, and the litigation that had occurred in other states. . . . *The question then was— and the people who adopted the constitution were so advised—whether we should adopt a constitution which provided in terms that no religious instruction should ever be a part, directly or indirectly, of the curriculum of our schools.*

(Italics mine.) *Dearle,* at 381.

The early Attorney Generals' opinions also demonstrate that Const. art. 1, § 11 oriented toward prohibiting certain kinds of devotional sectarian instruction in public primary and secondary schools. *See, e.g.,* AGO, Sept. 19, 1891 (Bible reading, prayers and devotional religious exercises in public

schools prohibited by Const. art. 1, § 11); AGO, Dec. 20, 1909 (unconstitutional to open public school day with prayer); AGO, Mar. 24, 1916 (unconstitutional to give public high school credit for optional Bible study).

This evidence is considerable and leads to only one conclusion: the historic purpose of the "religious instruction" clause of Const. art. 1, § 11 was to prevent public aid to parochial schools and to prohibit religious instruction in public primary and secondary schools. Neither of these concerns is implicated here. Although historical analysis is not necessarily dispositive in a question of state constitutional interpretation, *see State v. Reece,* 110 Wn.2d 766, 779, 757 P.2d 947 (1988), the majority does not suggest that current values and conditions conflict with the historical intent of this provision.

## C
### PREEXISTING STATE LAW AND DIFFERENCES IN STRUCTURE

Neither of the fourth or fifth *Gunwall* criteria appear to be applicable in this case. I have uncovered no record of preexisting state law pertaining to the "religious instruction" phrase of Const. art. 1, § 11 that would enhance our understanding of its meaning and purpose. Differences in state and federal constitutional structure do not appear relevant in interpreting this provision.

## D
### PARTICULAR STATE OR LOCAL CONCERN

*Gunwall* also advises the court to examine whether the matter is of particular state or local interest. *State v. Gunwall,* 106 Wn.2d at 67. Neither the history of Const. art. 1, § 11 nor the vocational training program at issue in this case reflect any particular state interest. As discussed above, the language of Const. art. 1, § 11 reflected a national consensus in the late 19th century to restrict sectarian religious instruction in the public schools and to prohibit public funding of sectarian institutions. This is the

context in which the phrased "religious instruction" was used by the local popular press of 1889.

Nor is there a particular state or local interest in the administration of the vocational training program for the blind. Eighty percent of the public funds used in this program derive from the federal government pursuant to an act of Congress. The state's interest is comparatively small.

Applying the *Gunwall* criteria to interpret Const. art. 1, § 11, I can only conclude that public funding of religious instruction, as that term was commonly understood by those who ratified our state constitution, is not involved in this case. Therefore, there is no basis for reaching a result contrary to the one reached by the United States Supreme Court under the federal establishment clause.

### V

I would hold that the granting of vocational rehabilitation assistance to Mr. Witters would not violate Const. art. 1, § 11. First, Mr. Witters is clearly entitled to receive at least that portion of vocational rehabilitation money representing federal funds. Second, the State has presented no evidence to support the majority's conclusion that all of Mr. Witters' vocational training involves "religious instruction". Third, the proper level of analysis is that of the funding program itself rather than the use of the funds by a qualified individual recipient. So long as the choice of which institution to attend for vocational training is that of the individual, the State's role in appropriating the funds is insufficient to come within the constraints of Const. art. 1, § 11.

DOLLIVER and DORE, JJ., concur with UTTER, J.

DOLLIVER, J. (dissenting)—By holding Larry Witters ineligible to receive funds to develop his employment skills merely because he made the personal choice to pursue a religious career, the court denies Witters his religious freedom as protected by the free exercise clause of the United States Constitution and diminishes his rights as a citizen.

In 1979 Larry Witters, who is legally blind, applied for vocational rehabilitation funds from the Washington State Commission for the Blind (Commission). *See* RCW 74.18-.030; Laws of 1983, ch. 194, § 3, p. 1050. The public assistance code in former RCW 74.16.181 stated the purpose of such funding was to "assist visually handicapped persons to overcome vocational handicaps and to obtain the maximum degree of self–support and self–care." *See* RCW 74.18.130; Laws of 1983, ch. 194, § 13, p. 1052.

Witters was found medically eligible for the Commission's funds and a hearing examiner held Witters' career goal of being a pastor, missionary, or youth director would, or could, lead to gainful employment which would meet the purpose of the program. The Commission, however, denied Witters the funds claiming the state constitution prohibited funding education of a religious nature.

On remand from the United States Supreme Court, which unanimously held there was no violation of the establishment clause of the First Amendment, the majority reaffirms the Commission and rules that even though Witters meets the purpose and the physical requirements of the program he is ineligible because the religious instruction needed for his career choice violates the Washington establishment clause, Const. art. 1, § 11. In reaching this result, the court is in direct conflict with the free exercise clause of the First Amendment.

I do not believe the state constitution ever meant to prohibit the individual choice of an adult in such a case as this (see dissent by Utter, J.). But even assuming the majority interpretation of the meaning of "religious instruction" is correct, it cannot supersede the free exercise clause. *See Reynolds v. Sims,* 377 U.S. 533, 584, 12 L. Ed. 2d 506, 84 S. Ct. 1362 (1964).

Witters chooses to carry out his religious beliefs by studying theology and becoming a minister. He became eligible for aid because of a physical handicap and is still eligible for that reason. Witters does not ask for an exception to the general rule of eligibility. He only asks the general rule to

be applied with equality, not for his choice of training to be disqualified because of its religious content.

While it is clear the majority believes there is no infringement of Witters' free exercise right, it neither offers any reasoning for such a conclusion based on the facts in this case, nor does it distinguish the federal cases which reach the exactly opposite conclusion.

Witters wants to become a minister, missionary, or youth leader to carry out his religious beliefs. The majority says Witters is not being denied benefits because of conduct arising from his religious beliefs. Majority, at 371. The argument that being a minister is a "career or calling" and is not a religious act within the protection of the free exercise clause has already been rejected by the Supreme Court. As Justice Brennan wrote in his eloquent concurrence:

> The [Tennessee] court stated that "[i]t is not religious belief, but the career or calling [of ministry], by which one is identified as dedicated to the full time promotion of the religious objectives of a particular religious sect, that disqualifies." . . .
>
> The characterization of the exclusion [of ministers or priests as delegates to a constitutional convention] as one burdening appellant's "career or calling" and not religious belief cannot withstand analysis. Clearly freedom of belief protected by the Free Exercise Clause embraces freedom to profess or practice that belief, even including doing so to earn a livelihood. One's religious belief surely does not cease to enjoy the protection of the First Amendment when held with such depth of sincerity as to impel one to join the ministry.

(Footnotes omitted.) *McDaniel v. Paty,* 435 U.S. 618, 630–31, 55 L. Ed. 2d 593, 98 S. Ct. 1322 (1978) (Brennan, J., concurring).

Although it is true the training to become a minister is an *act* prompted by belief and as such does not have the absolute protection that pure belief does (*Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940)), to say it does not fall within the protection of the free exercise clause is to deny the

reality of the motivation which impels one to become a minister or missionary. Witters wishes to practice his religion by making it his full-time vocation. It defies common sense, not to mention the Constitution of the United States, to say such an act is not within the sphere of the free exercise clause.

The final step in the majority's analysis is its claim that, while denial of vocational funds may make Witters' goal financially difficult or impossible, this denial does not violate the free exercise clause. The court cites Justice Douglas who stated that individuals cannot demand a sum of money from government in order to better exercise their religious scruples. *Sherbert v. Verner,* 374 U.S. 398, 412, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (Douglas, J., concurring).

For understandable reasons the majority fails to continue the quote, since Justice Douglas goes on to say:

> Those considerations, however, are not relevant here. If appellant is otherwise qualified for unemployment benefits, payments will be made to her not as a Seventh-day Adventist, but as an unemployed worker. Conceivably these payments will indirectly benefit her church, but no more so than does the salary of any public employee. Thus, this case does not involve the problems of direct or indirect state assistance to a religious organization—matters relevant to the Establishment Clause, not in issue here.

*Sherbert,* at 412–13.

Witters "otherwise qualifies". Payment should be made to him not as a ministry student, but as a visually handicapped student.

In another example of the importance of what it did not write rather than what was written, the majority totally ignores a line of cases which unmistakably hold an indirect burden on religion in the form of withholding benefits is an infringement on the right of free exercise. In *Sherbert,* for example, the Supreme Court stated "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." (Footnote omitted.) *Sherbert*

*v. Verner, supra* at 404. This is not an isolated instance. As the Court said in a recent case:

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas v. Review Bd.,* 450 U.S. 707, 717–18, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981). *Accord, Hobie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 94 L. Ed. 2d 190, 107 S. Ct. 1046 (1987).

Although acts protected by the free exercise clause are subject to regulation, the burden is on the government agency to prove a compelling state interest and to show its regulation is the least restrictive alternative. The State has offered no proof the complete denial of Witters' education was the least restrictive approach possible.

The only reason given for denying Witters his education is the need for greater separation of church and state than is provided under the First Amendment, which the majority believes can be found in the Washington Constitution. Majority, at 372–73. This is not enough. In a case originating in the state of Missouri, a student group wanted to use university facilities for religious activity. The Supreme Court found that once a public forum is created the First Amendment protection of free speech requires there be no discrimination based on the religious content of the speech. The Court ruled it was a compelling interest of the state to meet the requirements of the establishment clause, but that an equal access policy adequately met that requirement. *Widmar v. Vincent,* 454 U.S. 263, 70 L. Ed. 2d 440, 102 S. Ct. 269 (1981).

The importance of *Widmar* to the case before this court is that the Court did *not* find it a compelling reason that the State wanted greater separation of church and state

under its state constitution than was required by the federal establishment clause. In the words of the Supreme Court:

> Arguing that the State of Missouri has gone further than the Federal Constitution in proscribing indirect state support for religion, the University claims a compelling interest in complying with the applicable provisions of the Missouri Constitution.
>
> . . .
> . . . [T]he state interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well. In this constitutional context, we are unable to recognize the State's interest as sufficiently "compelling" to justify content–based discrimination against respondents' religious speech.

(Footnotes omitted.) *Widmar v. Vincent, supra* at 275–76.

Just as in *Widmar,* creating greater separation of church and state under our constitution than is required by the establishment clause of the federal constitution may be a rational reason, but it is not a compelling reason for the state when it comes in direct conflict with the free exercise clause of the First Amendment. *Accord, McDaniel v. Paty,* 435 U.S. 618, 55 L. Ed. 2d 593, 98 S. Ct. 1322 (1978).

In an age of government benefits, balancing separation of church and state and freedom of religion is complex and cannot be done by placing our state establishment clause above the federal free exercise clause. Professor Tribe describes the principles involved:

> Whenever both religion clauses are potentially relevant, as in *McDaniel [v. Paty, supra]*, the dominance of the free exercise clause follows from the principles underlying both clauses. For both clauses embody a broad concept of the relationship between religion and the state, which must be modified to adapt to changing conceptions both of religion and of government. If individuals and groups are to enjoy meaningful religious freedom, the protection afforded by the free exercise

clause must vary with the extent of governmental regulation and subsidy in society generally. The opinions of the Framers offer general guidance, expressed in such core values as voluntarism and separatism. In the context of these general values, we must consider whether a nation committed to religious pluralism must, in the age of the affirmative state, make active provision for maximum diversity; we must ask whether, in the present age, religious tolerance must cease to be simply a negative principle and must become a positive commitment that encourages the flourishing of conscience. Whenever tension is perceived between free exercise and non–establishment, ". . . a value judgment [is required] as to which is to become dominant . . .—the one premised on a vital civil right, or the one premised on . . . eighteenth century political theory. The resolution [is] preordained—to pose the conflict is to resolve it." Even if one takes a more charitable view of the political theory underlying the opposed position, it seems doubtful that sacrificing religious freedom on the altar of anti–establishment would do justice to the hopes of the Framers— or to a coherent vision of religious autonomy in the affirmative state.

(Footnote omitted.) L. Tribe, *American Constitutional Law* § 14–8, at 1204 (2d ed. 1988).

There are two recent Supreme Court cases concerning free exercise where either a plurality or majority applied a lower test of "a reasonable means for a legitimate purpose" standard in justifying the government imposing a burden on a person's religious freedom as opposed to the compelling reason and least restrictive alternative test of the earlier cases. The facts of these cases, however, are entirely different from those in this case. The regulations were facially neutral with regard to religion, and the religious acts did not trigger the government measures. *Bowen v. Roy*, 476 U.S. 693, 703, 90 L. Ed. 2d 735, 106 S. Ct. 2147 (1986) (statutory requirement that social security number be furnished as condition of eligibility for benefits under food stamp and aid to families with dependent children programs does not violate free exercise clause, notwithstanding belief that use of number would impair child's

spirit); *Lyng v. Northwest Indian Cemetery Protective Ass'n,* __ U.S. __, 99 L. Ed. 2d 534, 546, 108 S. Ct. 1319, 1325 (1988) (free exercise clause does not prohibit government from permitting timber harvest in or road construction through portion of national forest traditionally used for religious purposes by three Indian tribes). *See also* L. Tribe, *supra* at 1262–63.

In this case the statute as applied is not facially neutral. It has only one exclusion, as indicated in the policy statement by the Commission, which is for those who use the funds "in pursuit of a career or degree in theology or related areas." Here a religious classification triggers the disqualification, and under these circumstances, even the recent cases would apply the strict scrutiny test of requiring a compelling state interest. *See Hobbie v. Unemployment Appeals Comm'n, supra,* 94 L. Ed. 2d at 198, 107 S. Ct. at 1049.

Witters has met his burden of showing an infringement on his right of free exercise. The State has not met its burden of showing a compelling reason why it should be able to infringe on that right. To require Witters to abandon his religious vocation in order to retain his funding as a handicapped person—to require him to make such a choice—is to deprive him of the full benefits of citizenship. It is just such a diminishing of citizenship that the free exercise clause was meant to prevent. I dissent.

DURHAM, J. (dissenting)—I agree with Justice Utter that article 1, section 11 of the Washington State Constitution—the State's version of the federal establishment clause—does not bar the Washington State Commission for the Blind (Commission) from paying vocational benefits to Larry Witters, even though he intends to use the funds to attend a Christian college with the ambition of becoming a pastor, missionary or church youth director. However, Justice Utter relies on a number of arguments to reach this conclusion, only one of which is necessary to resolve the issues in this case.

The United States Supreme Court has already held that the Commission would not violate the federal establishment clause by disbursing the funds to Witters. *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 88 L. Ed. 2d 846, 106 S. Ct. 748, *reh'g denied,* 475 U.S. 1091 (1986). The Court reasoned that the funds were neutrally available to all aid recipients and the decision to use the funds to benefit religion was made by the individual recipient, not the State.[23] *Witters,* at 487–89. As Justice Utter points out in section IV of his dissent, consideration of the *Gunwall* criteria reveals that there is no reason to interpret the corollary state constitutional provision any differently on this particular point. Accordingly, the Commission would not violate Const. art. 1, § 11 by providing the funds to Witters.

Thus, I concur in section IV of Justice Utter's dissent. I also agree with much of the analysis in section II because it substantially mirrors the Supreme Court's analysis that is summarized above. I make no comment on sections I and III because there is no need to reach these issues.

---

[23]The opinion also notes that "importantly, nothing in the record indicates that, if petitioner succeeds, any significant portion of the aid expended under the Washington program as a whole will end up flowing to religious education." *Witters,* at 488. However, five Justices disagree with the importance of this fact. Justice Powell's concurrence, expressing the position of four other Justices, states that there would be no First Amendment violation in this case even if most of the funds distributed under the state program were eventually applied to religious education. *See Witters,* at 491 n.3 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.); *see also Witters,* at 490 (White, J., concurring) (agreeing with "most" of Justice Powell's analysis of this point); *Witters,* at 493 (O'Connor, J., concurring in part and concurring in the judgment) (finding this analysis "persuasive").